# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DEREK W. SHAW,

      **Plaintiff,**

   v.             **Case No. 23-CV-969**

MARTIN O'MALLEY,
Commissioner of the Social Security Administration,

      **Defendant.**

## DECISION AND ORDER

### 1. Introduction

Alleging he has been disabled since August 20, 2020 (Tr. 16), plaintiff Derek Shaw seeks supplemental security income and disability insurance benefits. Shaw's date last insured is June 30, 2025. (Tr. 19.) After his application was denied initially (Tr. 112) and upon reconsideration (Tr. 131), a hearing was held before Administrative Law Judge (ALJ) Margaret O'Grady on January 18, 2023 (Tr. 37). On March 24, 2023, the ALJ issued a written decision concluding that Shaw was not disabled. (Tr. 32.) After the Appeals Council denied Shaw's request for review on June 29, 2023 (Tr. 1-4), Shaw filed this action.

All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 4, 8) and the matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). The ALJ found that Shaw "engaged in substantial gainful activity during the following periods: the first and second quarters of 2022[.]" (Tr. 19.) She then stated, "[h]owever, there has been a continuous 12-month period(s) during which [Shaw] did not engage in substantial gainful activity. The remaining findings address the period(s) [Shaw] did not engage in substantial gainful activity." (Tr. 19.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). The ALJ concluded that Shaw has the following severe impairments: paranoid schizophrenia, insomnia, generalized anxiety disorder, posttraumatic stress disorder (PTSD), and attention deficit hyperactivity disorder (ADHD). (Tr. 19.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. §§ 404.1509, 416.909, the claimant is disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ found that Shaw "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (Tr. 20.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite his impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a). In making the RFC finding the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Shaw has the RFC "to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can

understand, remember, and carry out simple instructions. He requires regular work duties and expectations with only occasional changes. The claimant can occasionally interact with coworkers and supervisors but not interact with the public." (Tr. 22.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560, 416.920(a)(4)(iv), 416.960. The ALJ concluded that Shaw has no past relevant work. (Tr. 31.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c). At this step the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Shaw] can perform," including stocker (Dictionary of Occupational Titles (DOT) Number 727.687-030); garment worker (DOT Number 369.687-026); and sorter (DOT Number 509.686-018). (Tr. 31-32.)

## 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

## 4. Analysis

### 4.1. Subjective Symptom Evaluation

The ALJ must assess a claimant's symptoms (*i.e.*, "the individual's own description or statement of his or her physical or mental impairment(s)") using a two-step process. SSR 16-3p. First, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p. If step one is satisfied, at step two the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3p.

In addition to considering all other relevant evidence, the ALJ must also consider the following factors to the extent they are relevant:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p.

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ's conclusion is entitled to "special deference," and the court may disrupt it only if that assessment was "patently wrong." *Burmester*, 920 F.3d at 510; *Summers*, 864 F.3d at 528.

With respect to Shaw's allegations of disabling symptoms, the ALJ concluded:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 25.)

The ALJ explained that, despite his longstanding mental health symptoms, Shaw often demonstrated good function on examination. (Tr. 25.) She also noted that Shaw's treatment history did not include any hospitalizations or similarly intensive mental health treatments and that his symptoms improved when he took medication. (Tr. 26.) Additionally, while Shaw's treatment records included complaints of sleep disturbance and prescriptions for sleeping medications, the ALJ found no clinical findings associated with a lack of sleep in his treatment records. (Tr. 26.) Finally, she noted that Shaw worked during most of the period at issue, including a period of six months when he worked at the substantial gainful activity ("SGA") level, which, in the ALJ's eyes, showed that his symptoms were not as disabling as alleged. (Tr. 26.)

Shaw contends that the ALJ failed to set forth a legally sufficient evaluation of his symptoms. (ECF No. 12 at 7.) He first argues that the ALJ's conclusion that he exhibited good function on examination relies on a "gross mischaracterization" of the record. (*Id.* at 8.) In determining that Shaw exhibited "good function" on examination, the ALJ pointed to various normal findings documented during examinations between 2020 and 2022. (Tr. 25.) For instance, during exams with a mental treatment provider, Shaw exhibited normal mood, a pleasant attitude, euthymic effect, and was oriented to person, place, time, with fluent speech, fair insight and judgment, and normal psychomotor activity and memory. (Tr. 25 (citing Tr. 438-43).) During his exams with his treatment

provider, Matthew Hettenbach, NP, the ALJ emphasized that Shaw "was cooperative and had a normal appearance, good eye contact, coherent speech that was normal in rate, tone, and rhythm, no suicidality or homicidality, and normal psychomotor activity." (Tr. 25 (citing Tr. 314, 320, 326, 332, 338, 351, 357, 377, 383, 398, 473, 474, 482, 483, 486, 488, 492, 497, 499).) During his consultative psychological examination, Shaw was reported to have "some areas of good function." (Tr. 25 (citing Tr. 446-448).)

According to Shaw, his mental status examinations revealed both positive and negative findings with respect to his mental impairments. Shaw points out that every mental status exam cited by the ALJ also documented Shaw's anxious mood; flat affect; thought process noted as tangential, racing, and disorganized with loose associations; long-term memory loss; and impaired judgment and insight. (ECF No. 12 at 8 (citing Tr. 398, 383, 377, 363, 357, 351, 338, 332, 326, 320, 314, 499, 494, 488, 482, 474).) Additionally, he emphasizes that treatment notes also frequently documented pressured or tangential speech. (*Id.* (citing Tr. 417-18, 370, 492, 479, 473).) He argues that the ALJ failed to acknowledge these abnormal exam findings or explain how that evidence factored into her conclusion. (*Id.*)

The Commissioner responds that Shaw's argument "amounts to nothing more than his disagreement with how the ALJ analyzed the evidence, and [Shaw]'s displeasure with the fact that the ALJ did not summarize every piece of evidence in a light more favorable to [his] claim." (ECF No. 20 at 9.) "[T]he existence of an evidentiary dispute, in

and of itself, does not present a ground for reversing the ALJ's decision to credit one particular version of events over another." (*Id.* (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 n. 4 (7th Cir. 1990)).)

The ALJ did not outright ignore the abnormal examination findings. Earlier in her decision the ALJ provided a lengthy discussion of the medical evidence documenting Shaw's mental impairments in which she acknowledged Hettenbach's abnormal findings. (Tr. 24 (citing Tr. 314, 320, 326, 332, 338, 351, 357, 377, 383, 398, 473, 474, 482, 483, 486, 488, 492, 497, 499).) The ALJ also noted that, during an examination in December 2022, in which Shaw had reported being off of his medications for over a month, he reported having auditory and visual hallucinations, while the provider noted that he was anxious, had rapid and pressured speech, hyperactive behavior, and paranoid and delusional thought content. (Tr. 24 (citing Tr. 446-448).) The ALJ further observed that Shaw was reported to have tense body posture, a subdued effect with elements of anxiety and depression, in addition to problems concentrating during a psychological consultative examination in November 2022. (Tr. 24 (citing Tr. 432-36).)

The problem with the ALJ's assessment of Shaw's symptom allegations is that she did not explain why she found the normal examination findings more persuasive than the abnormal ones. It is not enough for an ALJ to merely discuss the objective medical evidence in a claimant's treatment history alongside his reported symptoms; she must provide "specific reasons for the weight given to the individual's symptoms." *Simila v.*

*Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *see also* SSR 16-3p. She must explain her "decision to credit some evidence over the contrary evidence, such that [a reviewing court] could understand the ALJ's logical bridge between the evidence and the conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014). Having an ALJ provide this explanation takes on additional importance when a claimant is suffering from mental impairments. *Cf. Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016).

While there are examination findings in the record that tend to support the ALJ's conclusion that the intensity, frequency, and limiting effects of Shaw's symptoms were not as severe as alleged, there are also findings from the very same providers that support his symptom allegations. Although the ALJ acknowledged both in her decision, she did not explain why she credited the normal findings over the abnormal ones, or explain how the normal findings informed her conclusion that, despite the abnormal findings, Shaw's symptoms are not as severe as alleged.

Shaw also argues that the ALJ erred in determining that his treatment history did not support the degree of limitation alleged. (ECF No. 12 at 9-10.) The ALJ found that Shaw's treatment has been routine, consisting of medication and supportive therapy, and she noted the absence of hospitalizations or similarly intensive mental health treatment. (Tr. 26.) She determined that Shaw's statements regarding medication side effects were not fully supported by the record because he sometimes reported having no side effects. (Tr. 26 (citing Tr. 324).)

The ALJ also found that Shaw's symptoms improved with medication, pointing to Shaw's "good function" exhibited during examinations between August 2021 and March 2022 while he was taking medications. (Tr. 26.) The ALJ further supported her conclusion by explaining that, during periods in which Shaw reported he had not been taking medication, treatment providers documented abnormal findings on examination. (Tr. 26.) For example, the ALJ points to an examination from December 2022 when Shaw had been off his medication for more than a month and was reported with rapid and pressured speech, hyperactive behavior, and paranoid and delusional thought content. (Tr. 26 (citing Tr. 446-48).)

Shaw argues that "hospitalization is not required in order to prove disability." (ECF No. 12 at 9 (citing *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015); *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 796 (E.D. Wis. 2004)).) But the ALJ did not state that hospitalization or intensive treatment was required in order for Shaw to be found disabled. She simply explained that Shaw's routine medication and therapy treatments, paired with the lack of more intensive treatment, indicated that his symptoms were not as severe as alleged. ALJs are allowed to consider the treatments an individual receives for their symptoms in evaluating symptom severity. *See* SSR 16-3p.

The problem lies with the ALJ's characterization of the effectiveness of those treatments. Shaw again accuses the ALJ of misstating the record in concluding that Shaw's symptoms improve when he takes medication and worsen when he is off his

medication. (ECF No. 12 at 9.) Shaw points out that the exam findings from August 2021 to March 2022 do not show good function and regularly document anxious mood, flat affect, tangential thought process with racing/loose associations and disorganization, and impaired judgment and insight. (*Id.*) "Many of these abnormal MSE findings and complaints persist despite Shaw explicitly taking his medications as prescribed." (*Id.* (citing Tr. 312, 338, 381-83, 479).)

As discussed above, the ALJ appeared to credit the normal findings from Shaw's mental health examinations over the abnormal findings but failed to explain her decision to do so. Without an explanation, it's unclear why the ALJ found that Shaw's symptoms improved with medication and worsened when he was not taking medication when he exhibited similarly abnormal findings regardless of whether he was taking medication.

Lastly, Shaw argues that the ALJ erred in relying on his part-time work activity in determining that his symptoms were not as severe as alleged. At step one the ALJ concluded that Shaw's earnings during the first two quarters of 2022 qualified as substantial gainful activity ("SGA"), but continued the analysis to address Shaw's claims with respect to the periods in which he did not engage in SGA. (Tr. 19.) Later in her decision, when evaluating Shaw's symptoms, the ALJ concluded that Shaw's symptoms were not as severe as alleged in part because Shaw worked during most of the relevant period, including the six-month period in which he worked at an SGA level. (Tr. 26.)

Shaw argues that the six-month period during the first half of 2022 should have been considered an unsuccessful work attempt. An unsuccessful work attempt is an effort to do work that discontinues or reduces to the non-SGA level after no more than six months because of the claimant's impairment or the removal of special impairment-related conditions that are essential to the claimant's performance of work. POMS DI 11010.145. According to Shaw, because both of his jobs during the first half of 2022 "lasted less than six months and ended due to Shaw's mental health symptoms," they should have been considered unsuccessful work attempts, which "per POMS section DI 11010.145—'does not prevent a finding of disability.'" (ECF No. 12 at 12.) He points out that there is no requirement that a claimant be found disabled for a period of work to qualify as an unsuccessful work attempt. (*Id.*)

Shaw appears to argue that, because the ALJ did not consider Shaw's work during this period to be an unsuccessful work attempt, she should not have concluded that his work history undermined his symptom allegations. (*See* ECF No. 12 at 12 (citing *Wilder v. Apfel*, 153 F.3d 799, 801 (7th Cir. 1998)) ("A claimant's desire and attempts to work do not undermine a claim of disability.").) In reply, he explains that "the ALJ's use of such work to undermine Shaw's statements he cannot perform sustained work on a regular and continuing basis is nonsensical" because Shaw had to leave those jobs because of his mental impairments and related symptoms. (ECF No. 21 at 3.) Shaw points to various

treatment notes indicating that he lost his jobs because of his hallucinations. (*See* ECF No. 12 at 12, n. 5 (citing Tr. 437, 486, 482, 473, 447, 57-58).)

The Commissioner responds that an ALJ is allowed to rely on a claimant's part-time work activity in assessing a claimant's allegations of disabling symptoms. (ECF No. 20 at 11 (citing *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)).) "Here, Plaintiff's work activities during the relevant period went far beyond parttime work. Plaintiff's earnings exceeded $15,000 for two quarters in 2022, and according to his own statements, he worked fulltime and overtime doing snow removal." (*Id.* (citing Tr. 30, 404, 438, 446, 492).) The Commissioner contends that the ALJ properly rejected Shaw's argument that his work during the first half of 2022 constituted an unsuccessful work attempt. (*Id.*)

Shaw only brings up the ALJ's alleged failure to count his work during the first half of 2022 as an unsuccessful work attempt in the context of the ALJ's symptom assessment. In this respect, the issue is not whether Shaw's part-time work in the first half of 2022 qualified as SGA or an unsuccessful work attempt. Rather, the issue is whether the ALJ sufficiently explained her conclusion that Shaw's part-time work undermined his symptom allegations. While, as the Commissioner points out, an ALJ may consider a claimant's work activity when evaluating the severity of his symptoms, here the ALJ did not provide a sufficient explanation as to how she considered Shaw's part-time work in assessing his symptoms. She did not explain why she found that Shaw's part-time work during this period undermined his allegations of disabling symptoms despite the

evidence suggesting that he lost those jobs due to his impairments. Nor does she explain why his work activity during other periods undermined his statements of disabling symptoms. As such, the ALJ failed to establish an accurate and logical bridge between the evidence and her conclusion. *See Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018).

In sum, the ALJ's assessment of Shaw's symptom allegations lacks sufficient explanation. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)) ("We will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong' meaning it lacks explanation or support.") Remand is required so the ALJ can explain why she credited certain objective medical evidence over other such evidence, and how the evidence informs her conclusions regarding the severity of Shaw's symptoms.

### 4.2. Medical Opinion Evidence

NP Hettenbach opined that Shaw would likely exhibit verbal outbursts of anger several times per week or more depending on his frustration level; that he would be absent from work more than four days per month due to his impairments; would require unscheduled breaks four to five times per day; would likely be off task 20 percent of the workday; would work be able to perform full-time work on a sustained basis at a pace of 60-70 percent compared to an average worker; and would need an unusual level of

supervision to start or complete even simple work tasks several (more than three) times per day, depending on whether his psychosis is active.[1] (Tr. 306-08.)

An ALJ must assess a medical opinion in terms of its persuasiveness, paying particular attention to how well the expert supports his opinion, how consistent the opinion is with the record, the expert's relationship with the claimant, the expert's specialization and expertise, and any other particularly relevant factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). Although an ALJ must consider all of these factors, he need only explain how he considered supportability and consistency. 20 C.F.R. §§ 404.1520c(b), 416.920c(b).

The ALJ found that NP Hettenbach's opinion was not persuasive because it was inconsistent with the medical and non-medical evidence in the record. The ALJ explained that NP Hettenbach's opinion that Shaw would have several outbursts of anger several times a week or more depending on frustration level was inconsistent with treatment records regularly noting that Shaw was cooperative and pleasant on examination. (Tr. 29 (citing Tr. 314, 320, 326, 332, 338, 351, 357, 369, 370, 371, 377, 383, 398, 404, 405, 408, 411, 438-443, 446-451, 460, 463, 466, 473, 474, 478, 482, 483, 486, 488, 492, 497, 499)).

---

[1] NP Hettenbach included further limitations as to Shaw's ability to work, but Shaw focuses on the above restrictions in arguing that the ALJ erred in his assessment of NP Hettenbach's opined limitations. (*See* Tr. 306-08; ECF No. 12 at 14.)

The ALJ found Hettenbach's opinion that Shaw would miss more than four days of work per month inconsistent with Shaw's "good function" on examination during periods in which he was compliant with his medication. (Tr. 29.)

The ALJ also determined that Hettenbach's opinion that Shaw would need four to five unscheduled breaks per day was inconsistent with the absence of "clinical findings associated with the medication side effects that would support the limitation, such as a fatigued, tired, or lethargic appearance." (Tr. 29.) Instead, the ALJ found that the medical evidence suggested that "[t]reatment providers regularly noted the claimant to be alert, fully oriented, and cooperative," and that Shaw had been advised that he would have less side effects as he became more consistent with his medications. (Tr. 29 (citing Tr. 314, 320, 326, 332, 338, 351, 355, 357, 369, 370, 371, 377, 383, 398, 404, 405, 408, 411, 438-443, 446-451, 460, 463, 466, 473, 474, 478, 482, 483, 486, 488, 492, 497, 499).)

The ALJ further found Hettenbach's opinion that Shaw would be off task 20 percent of the workday inconsistent with consultative psychological examination findings showing that Shaw worked slowly due to concentration issues but was able to complete serial threes without error, as well as the fact that Shaw frequently showed normal attention. (Tr. 30 (citing Tr. 369, 370, 371, 404, 405, 408, 411, 446-449, 451, 460, 463, 466).)

As to Hettenbach's opinion that Shaw would be able to perform full time work on a sustained basis only 60 to 70 percent of the time, the ALJ stated that this opinion was

inconsistent with examination findings suggesting that Shaw is cognitively intact and had normal attention. (Tr. 30 (citing Tr. 369, 370, 371, 404, 405, 408, 411, 446-449, 451, 460, 463, 466).) The ALJ also found this opinion inconsistent with Shaw's reports of working full-time and over-time doing snow removal in 2022. (Tr. 30.)

Finally, the ALJ stated that Hettenbach's opinion that Shaw would require an unusual amount of supervision was inconsistent with the medical evidence showing "good function" on examination when he takes his medication as prescribed, as well as Shaw's own statements regarding work activities, which did not reflect that he needed additional supervision. (Tr. 30 (citing Tr. 37-68).)

Shaw argues that the ALJ "finds these opinions to be 'not persuasive' for the very same reasons she finds Shaw's statements inconsistent with the Record." (ECF No. 12 at 14.) That is, the ALJ discounted Hettenbach's opinion by referring to Shaw's "good function" and pointing to positive examination findings without addressing the abnormal findings. (*Id.* (citing *Moore*, 743. F3d at 1123).)

The Commissioner responds that substantial evidence supports the ALJ's decision to discount Hettenbach's opinion and repeats his argument that Shaw simply disagrees with the ALJ's summary of the evidence in the record and maintains that the ALJ properly assessed the medical evidence in the record. (ECF No. 20 at 6.)

As indicated above, in her assessment of Hettenbach's opinion, the ALJ frequently referred to Shaw's "good function" and his normal examination findings from the

relevant period without discussing abnormal findings from those very same examinations. Her discussion of the medical evidence when assessing Hettenbach's opinions is similarly selective, which tends to undermine much of her reasoning for discounting Hettenbach's opinion. As a result, the ALJ failed to establish the requisite accurate and logical bridge between the evidence and her conclusion. Remand is required so the ALJ can reassess Hettenbach's opinion and explain her decision to credit the normal examination findings over the abnormal ones.

### 4.3. Residual Functional Capacity Determination

The ALJ found that Shaw's mental impairments resulted in a mild limitation in understanding, remembering, and applying information. (Tr. 21.) She also found that Shaw had moderate limitations in interacting with others; concentration, persistence, and pace; and adapting and managing himself. (*Id.* at 22.) To account for these limitations, the ALJ included certain restrictions in Shaw's residual functional capacity ("RFC") determination:

> The undersigned accommodates the claimant's mental conditions and related moderate "paragraph B" limitations by finding he can do work that requires him to understand, remember, and carry out simple instructions. He requires regular work duties and expectations with only occasional changes. The claimant can occasionally interact with coworkers and supervisors but not interact with the public.

(Tr. 24-25.)

It is well-established that "[b]oth the RFC and the hypothetical question presented to a VE must incorporate the 'totality of a claimant's limitations,' including any

'deficiencies of concentration, persistence and pace.'" *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (unpublished) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)). "The ALJ need not use this exact terminology, so long as the phrasing 'specifically exclude[s] those tasks that someone with the claimant's limitations would be unable to perform.'" *Id.* (alteration in original). "Even generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." *Urbanek v. Saul*, No. 19-1394, 796 F. App'x 910, 914 (7th Cir. 2019) (unpublished).

Shaw contends that the ALJ's RFC finding fails to properly account for his moderate limitations in concentration, persistence, and pace ("CPP"). (ECF No. 12 at 18.) According to Shaw, medical evidence in the record supported the inclusion of specific restrictions regarding CPP limitations in the RFC. (ECF No. 12 at 18.) He points to the opinions of Hettenbach, psychological consultative examiner Mark Pushkash, Ph.D., and state agency reviewing psychologist Jason Kocina, Psy.D., arguing that their opinions supported including restrictions such as a slower work pace, time off task, the need for unscheduled breaks, and absenteeism. (*Id.*)

As mentioned above, Hettenbach opined that Shaw's CPP limitations would cause him to be absent from work more than four days per month due to his impairments; require unscheduled breaks four to five times per day; be off task 20 percent of the

workday; perform full-time work on a sustained basis at a pace of 60-70 percent compared to an average worker; and need an unusual level of supervision to start or complete even simple work tasks several (more than three) times per day, depending on whether his psychosis is active. (Tr. 306-08.) Dr. Pushkash opined that Shaw's "ability to concentrate and persist on tasks in a work environment would be markedly impaired due to interfering effects of a high level of anxiety." (Tr. 435.) Dr. Kocina opined that Shaw was moderately limited in the area of CPP, and "would have breaks in concentration but should be able to complete [his] assigned simple tasks within acceptable standards." (Tr. 76.) The ALJ did not find any of these opinions particularly persuasive and did not adopt their opined restrictions in her RFC finding. The court has already determined that the ALJ erred in her assessment of Hettenbach's opinion. Although Drs. Pushkash and Kocina both assessed lesser CPP restrictions than Hettenbach, their opinions were also rejected by the ALJ. The ALJ found Dr. Pushkash's opinion was not persuasive because it was inconsistent with the medical evidence, such as Pushkash's own notes stating that, while Shaw worked slowly, he was able to complete serial threes without error, as well as treatment notes indicating that Shaw regularly demonstrated normal attention. (Tr. 28 (citing Tr. 314, 320, 326, 332, 338, 351, 357, 377, 383, 398, 473, 474, 482, 483, 486, 488, 492, 497, 499).) The ALJ found that Dr. Kocina's opinion that Shaw would be able to complete assigned work tasks within acceptable standards despite having breaks in concentration only somewhat persuasive because Dr. Kocina did not define "acceptable standards." (Tr.

27.) Shaw does not argue that the ALJ erred in assessing the opinions of Drs. Pushkash and Kocina.

Shaw also overlooks other aspects of the ALJ's analysis in crafting an RFC to account for Shaw's moderate CPP limitations. At step three, the ALJ explained that Shaw's daily activities reflected "some ability to sustain focus and attention and see a task through to completion," because he reported that he had no issues with personal care, and that he could fix himself simple foods. (Tr. 21.)

Moreover, in addition to the medical opinions discussed above, the ALJ assessed the opinion of state agency reviewing psychologist Therese Harris, Ph.D, who opined that Shaw had a moderate CPP limitation, explaining that he would be able to maintain focus, pace, and persistence for simple tasks for two-hour periods over an eight-hour workday within a normal work schedule. (Tr. 98.) The ALJ found Dr. Harris's opinion somewhat persuasive, explaining that the medical evidence did not support the opinion that Shaw could maintain focus, pace, and persistence for simple tasks for two-hour periods because Shaw regularly demonstrated normal attention on examination, and because it was inconsistent with Shaw's own description of his work activities, as he stated that he works for three to four hours at a time. (Tr. 27 (citing Tr. 37-68, 314, 320, 326, 332, 338, 351, 357, 377, 383, 398, 473, 474, 482, 483, 486, 488, 492, 497, 499)).) Again, Shaw does not challenge the ALJ's reliance on this evidence.

While the ALJ recognized that Shaw had problems warranting a moderate limitation in the area of concentration, persistence, and pace, she found that restricting him to carrying out simple instructions in a job that had regular work duties and expectations with only occasional changes would adequately account for those limitations. Substantial evidence supports her conclusion not to include further restrictions. Throughout her decision, the ALJ explained why additional restrictions, including those advanced by Shaw, were not warranted. Shaw has not demonstrated that the ALJ erred in accounting for Shaw's CPP limitations in her RFC.

### 5. Conclusion

The ALJ failed to adequately explain her determination that Shaw's symptoms were not as severe as alleged. Specifically, she did not explain why she credited positive examination findings over abnormal ones, leaving a disconnect between the evidence and his conclusion that Shaw's symptoms were not severe as alleged. Nor did she explain why she found Shaw's part-time work inconsistent with his symptoms. On remand, she must explain how the evidence informs her overall conclusion that Shaw's symptoms were not as severe as alleged.

Additionally, the ALJ erred in assessing the persuasiveness of NP Hettenbach's opinion by relying on evidence that contradicted Hettenbach's opinion, while failing to address the medical evidence supporting his opinion. On remand, the ALJ must reassess

Hettenbach's opinion with an emphasis on the consistency his opinion with the other evidence in the record.

A direct award of benefits, however, is inappropriate because not all factual issues have been resolved, *see Israel v. Colvin*, 840 F.3d 432, 441-42 (7th Cir. 2016), and the evidence is not such that it "can yield but one supportable conclusion." *Martin v. Saul*, 950 F.3d 369, 376 (7th Cir. 2020) (quoting *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **vacated**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of July, 2024.

WILLIAM E. DUFFIN
U.S. Magistrate Judge